No. 84-240

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

MICHAEL KELLY PHELPS,

Defendant and Appellant.

_____

APPEAL FROM: District Court of the Nineteenth Judicial District,
In and for the County of Lincoln,
The Honorable Robert M. Holter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

David W. Harman argued, Libby, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Patricia Schaeffer argued, Asst. Atty. General, Helena
William A. Douglas, County Attorney, Libby, Montana
Thomas R. Bostock argued, Deputy County Attorney,
Libby, Montana

_____

Submitted: January 25, 1985

Decided: March 13, 1985

Filed: MAR 1985

_____
Clerk

Mr. Chief Justice J. A. Turnage delivered the Opinion of the Court.

Michael Phelps appeals convictions of two counts of deviate sexual conduct from the Lincoln County District Court. The defendant was found guilty of these charges after a two-day jury trial held February 22 and 23, 1984. He was sentenced to six years imprisonment on each count, the terms to run consecutively. We affirm.

Michael Phelps at the time of the alleged criminal acts was twenty years old and had a ninth grade education. On September 1, 1983, Theresa Jones, mother of David, five; John, seven; Michelle, eight; and Michael, eleven, of Troy, Montana, left her children in the care of the defendant to go grocery shopping. When she returned home several hours later, she found the two younger boys hiding in a bedroom closet. David and John were dressed in women's clothing. The next day, the boys told her that the defendant had sexually molested them. Subsequent examinations by local physicians indicated the possibility of sexual abuse, although the reports were not conclusive.

On September 8, 1983, the defendant was asked to appear at the Troy police station for questioning. Neal Bauer, a detective sergeant with the Lincoln County sheriff's department, conducted the questioning and Martin Koskela, a deputy sheriff, was present during the interview. Detective Bauer was trained in interrogation techniques used in sexual assault investigations. When Phelps first arrived that afternoon, the two officers read him his Miranda rights, had him sign a Miranda waiver, and proceeded to question him about the molestation incidents. The interrogation lasted just under one and one-half hours and was broken into three

2

sessions separated by two short breaks. The first session lasted seven minutes, the second approximately an hour, and the third seven minutes.

The interrogations were tape recorded and a transcript was made. The defendant was only read his complete Miranda rights at the beginning of the first session. In the subsequent sessions, he was reminded of these rights and asked whether he understood those rights and knew he was waiving them. The defendant answered affirmatively.

Initially, Phelps denied any contact with the boys. In the first session a bundle of woman's undergarments belonging to Phelps was placed on a table in front of the defendant. This evidence potentially embarrassed Phelps who admitted he enjoyed wearing such clothing in the privacy of his home.

During the second session on September 8, the defendant did state that he had sexual contact with the boys. He also asked to see his father but was told that he would have to wait until the police were finished questioning him. Defendant's father was waiting outside the police offices at this time.

In the third session the defendant fully implicated himself in the sexual crimes. The defendant's confession followed suggestions made by the officers of what he had done. Phelps admitted that he fondled the penis of both of the boys and pushed a pencil up the rectum of one of the children. He was subsequently charged by information with two counts of deviate sexual conduct.

After a court-ordered mental examination at the state hospital, the defendant was found competent to stand trial. On November 9, 1983, counsel filed a motion to suppress the September 8 confession and a motion to sever the two counts

3

into separate trials. Phelps's position at the suppression hearing was that he had fabricated the confession story only to end the interrogation; he asserted that he was in fact innocent of the crimes charged. At this time the defendant also stated that he had been induced into the confession by promises that he would receive mental health treatment at the state hospital. The motion to suppress was denied and the motion to sever was never acted on.

A jury found Phelps guilty of both counts of deviate sexual conduct. Deviate sexual conduct is codified at § 45-5-505, MCA:

> "(1) A person who knowingly engages in deviate sexual relations or who causes another to engage in deviate sexual relations commits the offense of deviate sexual conduct.
>
> "(2) A person convicted of the offense of deviate sexual conduct shall be imprisoned in the state prison for any term not to exceed 10 years or be fined an amount not to exceed $50,000, or both. . . ." (Emphasis added.)

Deviate sexual relations is defined in the criminal code to be, "sexual contact or sexual intercourse between two persons of the same sex or any form of sexual intercourse with an animal." Section 45-2-101(20), MCA.

Phelps appeals the judgment and sentencing of the District Court and raises the following issues:

(1) Whether the District Court abused its discretion in admitting the defendant's confession into evidence.

(2) Whether the District Court abused its discretion in determining that a five-year-old child was competent to testify.

(3) Whether the District Court abused its discretion in not severing the counts into separate trials.

4

(4) Whether the cumulative error doctrine applies, and whether the defendant received a fair trial.

I

Appellant argues that his confession was involuntary due to psychological coercion evidenced by the following alleged facts: (1) the officers lied to him about the existence of a medical report concerning the child abuse; (2) the sack of women's clothing that Phelps occasionally wore was thrown on the table during questioning; (3) the officers induced him to confess by promising future mental counseling; (4) the confession followed the exact pattern of leading questions; (5) Phelps interchanged the names of the two boys; (6) the officers refused to let him see his father during the interrogation; and (7) prior to the interrogation the defendant had denied committing the offenses to other officers.

Appellant cites authority for the proposition that voluntariness depends on the totality of the circumstances. He argues that reversal is warranted in this case because there is not substantial credible evidence to support the District Court's admission of the confession.

The State notes that the issue of voluntariness is a factual determination to be made by the trial court. State v. Lenon (1977), 174 Mont. 264, 570 P.2d 901. The State points out that the defendant did not claim at trial or on appeal that his Miranda rights were not honored. The State maintains that the defendant's testimony at the suppression hearing clearly reflects his understanding of the underlying constitutional rights:

> "Q. [Deputy County Attorney] When Detective Bauer advised you that at the beginning of these statements you had a

5

right to remain silent, did you understand that?

"A. [Phelps] Yes, I did.

"Q. And when he advised you that you had a right to an attorney, did you understand that?

"A. Yes.

"Q. Did you ask at any time for an attorney during the taking of these statements?

"A. No.

"Q. Did you ever ask them just to stop, that you didn't want to continue anymore?

"A. I was tempted, yes.

"Q. But you didn't ask them, did you?

"A. No. Because I wanted to figure out what the heck they were up to."

Thus, this case is distinguishable from federal and Montana case law in which the validity of the waiver of constitutional rights was challenged. In the case at bar the voluntariness of the confession is questioned.

The parties agree on the case law that must be applied to the facts of this case. This Court has addressed the voluntariness issue in five major appellate decisions over the past several years. State v. Davison (Mont. 1980), 614 P.2d 489, 37 St.Rep. 1135; State v. Allies (1979), 186 Mont. 99, 606 P.2d 1043; State v. Blakney (1979), 185 Mont. 470, 605 P.2d 1093, cert. granted, Blakney v. State of Montana (1981), 451 U.S. 1013, 101 S.Ct. 2999, 69 L.Ed.2d 384, aff'd, State v. Blakney (1982), 197 Mont. 131, 641 P.2d 1045; State v. Grimestad (1979), 183 Mont. 29, 598 P.2d 198; State v. Lenon (1977), 174 Mont. 264, 570 P.2d 901.

6

The principles discussed in these cases have been consistently set forth; there exists no need to review their application in depth.

A common theme in appellant's arguments is a claim of diminished mental capacity and evidence of mental illness. Michael Phelps, in the years preceding these offenses, received psychological counseling at the Western Montana Mental Health Clinic. In the pretrial mental health evaluation Phelps was diagnosed by a clinical psychologist and psychiatrist as suffering a schizophrenic disorder. The psychological report indicated Phelps had a full scale I.Q. of 91, verbal I.Q. of 99, and performance I.Q. of 83. This report was prefaced by the statement that: ". . . Mr. Phelps performs at the average level of intelligence . . ."

Mental illness or deficiency does not in itself preclude admissibility of defendant's statements so long as he was capable of understanding the meaning and consequences of his statements. It is an important factor to consider in examining the totality of the circumstances, but it is not conclusive. Schade v. State (Alaska 1973), 512 P.2d 907; People v. Watson (Cal.App.3d 1977), 142 Cal.Rptr. 134; People v. Lara (Cal. 1967), 432 P.2d 202; State v. Kreps (Hawaii App. 1983), 661 P.2d 711; State v. Thompson (Kan. 1976), 558 P.2d 1079; Criswell v. State (Nev. 1970), 472 P.2d 342; State v. Davis (Wash.App. 1983), 662 P.2d 78; State v. Allen (Wash. 1965), 406 P.2d 950. See also Annot., 69 A.L.R.2d 348, 350 (1960).

The psychological report and the defendant's own answers at trial demonstrate average intelligence. The fact that Phelps received psychological counseling and had been diagnosed as a schizophrenic is not conclusive on the

7

question of voluntariness. People v. Watson, 142 Cal.Rptr. at 140 (schizophrenic condition does not render defendant incapable of effectively waiving his rights, nor does evidence of subnormality require the automatic exclusion of a confession). No expert testimony was offered to the effect that Phelps was highly susceptible to suggestion due to mental illness or mental deficiency. See People v. Parks (Colo. 1978), 579 P.2d 76, and cases cited therein. Furthermore, the record reflects that he was capable of independently and intelligently answering questions at the police station and at the suppression hearing.

A second allegation is that the confession was induced by Detective Bauer's promise of future mental treatment. Phelps's exact testimony was that Bauer gave him "the distinct impression that to some extent he would recommend to the Court that I be put into Warm Springs [State Hospital]." The allegation is significant for the United States Supreme Court has held:

> "To be admissible, a confession must be '"free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."'" Brady v. United States (1970), 397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747, 759 (quoting Bram v. United States (1897), 168 U.S. 532, 542-543, 18 S.Ct. 183, 187, 42 L.Ed. 568, 573).

The fact that Detective Bauer did not fully recall making any implied promise to Phelps does not constitute a denial that such assurances were made. We note that the interrogating officers turned off their tape recorder before the alleged conversation took place on September 8.

Reviewing Phelps's and Bauer's testimony on this topic, we can surmise that Phelps was given the impression that there would be the possibility of treatment at the Warm Springs State Hospital. However, we hold that such reassurance does not render the subsequent confession inadmissible. This alleged promise was couched in terms of a mere possibility or an opinion; as such, it does not constitute a sufficient promise to render a confession involuntary. See, State v. McVay (Ariz. 1980), 617 P.2d 1134 (confession properly admitted where it was induced by prison officer's promise to speak to the warden about getting defendant removed from isolation cell). But cf., State v. Capwell (Or.App. 1983), 669 P.2d 808 (pre-Miranda statements rendered defendant's confession involuntary in violation of state constitution where officers told defendant that the court would consider treatment instead of incarceration providing defendant confessed, and defendant was convinced that by telling the truth he would not go to court).

The investigating officer in this case walked a thin line between constitutionally permissible police conduct and reversible error. The conduct falls somewhere between a situation where an officer tells a defendant that psychiatric treatment is available if needed, State v. Allies, 606 P.2d at 1046 (confession suppressed on other grounds), and a case where a defendant is promised treatment at the state mental hospital in return for a confession. The latter situation clearly violates the defendant's constitutional rights. Our law enforcement officers would do well to review the dictates of Brady v. United States, 397 U.S. at 753, and proscriptions therein against "implied promises, however slight."

9

An additional transgression of police conduct was potentially committed in this case. Detective Bauer informed Phelps in the first few minutes of his interrogation: ". . . we've even got a doctor's report on this . . . we've got all the evidence." The State argues that this observation is not a falsehood; a doctor had examined the victim prior to September 8.

Detective Bauer possessed no medical report from the examining physician, Dr. Griffith, at the time this declaration was made. Bauer's partner, Officer Koskela, had talked to the physician concerning his findings. However, those findings were inconclusive.

In State v. Lenon, 570 P.2d at 906, this Court stated:

> "We cannot overemphasize our strong condemnation of police practices . . . wherein a police officer misinforms a defendant as to other arrestees having given confessions . . .."

Similarly, we cannot condone the tactics of this officer who informed Phelps as to the existence of incriminating evidence when the evidence was inconclusive.

Appellant has raised other allegations of coercion. We have examined these contentions and find no impropriety in the display of women's clothing, use of leading questions, refusal to honor Phelps's request to talk to his father and prior denials of the accused.

The combination of all the circumstances surrounding this confession does not mandate suppression. The totality of the circumstances in this case includes: (1) the length of the interrogation and its breaks; (2) written and oral waivers of constitutional rights; (3) defendant's testimony at the suppression hearing that he understood these rights; (4) the mental condition of the defendant; (5) defendant's

10

impression that Bauer would recommend mental treatment at Warm Springs; and (6) the statement of Detective Bauer concerning a doctor's report.

A preponderance of the evidence supports the trial court's holding that, in the totality of the circumstances, Phelps's confession was voluntary.


## II

The second issue raised by appellant concerns the competency of witness John, age five. The District Court judge qualified the witness outside the presence of the jury and concluded that the boy was marginally qualified and that the jury should measure the effect and weight of his testimony.

Appellant alleges that John was "coached" into testifying. Appellant points out errors in the child's perception of where he was when he testified and who the judge was. The child stated at one point that he thought he was in a police station and that the robed judge was a karate expert. The State notes that John knew the difference between a truth and a lie and was aware of his duty to tell the truth in court.

There is no fixed age at which a person is considered too young to testify. The relevant rule of evidence states:

> "Rule 601. Competency in general; disqualification.
>
> "(a) General rule competency. Every person is competent to be a witness except as otherwise provided in these rules.
>
> "(b) Disqualification of witnesses. A person is disqualified to be a witness if the court finds that (1) the witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can

11

> understand him _or_ (2) the witness is
> _incapable_ of _understanding the duty of a_
> _witness to tell the truth_." Rule 601,
> Mont.R.Evid. (Emphasis added.)

This rule was recently interpreted in State v. Rogers (Mont. 1984), 692 P.2d 2, 41 St.Rep. 2131. In _Rogers_, this Court upheld the lower court's determination that a four-year-old girl was competent to be a witness in a sexual abuse case. We noted that whether a child is competent to be a witness is a determination left largely to the discretion of the trial court. State v. Campbell (1978), 176 Mont. 525, 529, 579 P.2d 1231, 1233. The trial court must determine whether the child understands the duty to tell the truth. State v. Shambo (1958), 133 Mont. 305, 322 P.2d 657.

The appellant's cases on "coached" witnesses are distinguishable. In the three cited cases, coaching was manifest from the record. In Cross v. Commonwealth (Va. 1953), 77 S.E.2d 447, and People v. Delaney (Cal. App. 1921), 199 P. 896, the children repeated a story their mothers told them to tell to the judge. In Lanoue v. State (Nev. 1983), 661 P.2d 875, the five-year-old witness indicated considerable confusion concerning the concepts of truth and falsehood.

The inconsistencies in John's perception of where he was do not affect his competence. Competence is determined by capacity of expression and appreciation of the duty to tell the truth. There was no error committed by the District Court in admitting John's testimony and allowing the jury to measure its weight.

Phelps argues that the two counts of deviate sexual conduct should have been tried separately. The relevant statutory basis of this claim is § 46-11-404, MCA:

> "Joinder and severance of offenses and defendants. . . .
>
> "(2) The court in which the case is triable, in the interests of justice and for good cause shown, may, in its discretion, order that the different offenses or counts set forth in the indictment, information, or complaint be tried separately or divided into two or more groups and each of the groups tried separately. An acquittal of one or more counts shall not be considered an acquittal of any other count.
>
> ". . .
>
> "(4) If it appears that a defendant or the state is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial, the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require."

Appellant notes in his brief that: (1) considerations of judicial economy exert strong pressure in favor of joint trials; (2) defendant must show more than mere prejudice or that he had a better chance of acquittal with separate trials; (3) defendant must show the prejudice was so great as to prevent a fair trial; and (4) the balancing of prejudice and judicial economy is left to the sound discretion of the trial judge. However, the appellant argues that he has met his burden and shown prejudice that constitutes reversible error.

It is the State's position that the defendant waived the severance issue. The hearing on the motion to suppress and the motion to sever was set for December 9, 1983. The suppression issue was heard first and this discussion followed:

"MR. HARMAN [Appellant's Attorney]: Can we continue to the hearing as to the other motions that are set forth today too?

"THE COURT: I am sorry, yes.

"MR. HARMAN: We might as well clear this up as long as we are here today.

"THE COURT: I had forgotten there were others.

"MR. HARMAN: The minute entry indicates we are going to hear the Defendant's motion to sever today, and on November 9 the Defendant filed a motion to sever, and I do not intend to pursue that matter any further. . ."

There was no further discussion on the motion and the District Court never issued a ruling.

We do not reach the issue of waiver for we find no prejudice to defendant that outweighs considerations of judicial economy. Additionally, the State argues persuasively that the effect of two separate trials on the young victims of these crimes should be considered. Each would potentially be a witness in both trials and be compelled to appear and testify twice.

IV

As a final matter, Phelps argues that a number of prejudicial errors combined to deprive him of a fair trial. The brief of appellant states:

"Here, the cumulative error is the combination of use of evidence of prior acts without notice to the Defendant, the prosecutor's improper closing argument, juror misconduct in reading a newspaper account."

Many of these claimed errors were not raised at trial and may not be raised on appeal. Additionally, appellant has

failed to prove prejudice.    Mere allegations of error are insufficient to invoke the cumulative error doctrine.

The convictions in the District Court are affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____

_____

_____
Justices

15